**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ILLUSIONIST DISTRIBUTION, LLC, <br><br>            Plaintiff, <br><br>     v. <br><br> SONY PICTURES CLASSICS, INC., et al., <br><br>            Defendants. | Case No. CV 10-08062 DMG (MANx) <br><br> **ORDER RE PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT FOLLOW** |

This matter is before the Court on Plaintiff's *Ex Parte* Application for Temporary Restraining Order ("TRO") and Order to Show Cause Why Preliminary Injunction Should Not Follow ("*Ex Parte* Application"). The Court deems this matter suitable for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. For the reasons set forth below, the *Ex Parte* Application is DENIED.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Illusionist Distribution, LLC is the exclusive owner of the worldwide copyrights and unregistered trademarks to the 2006 motion picture "The Illusionist." (Brown Decl. ¶ 1.)  Defendant Sony Pictures Classics, Inc. ("SPC"), pursuant to an

agreement with Defendant Pathé Distribution S.A.S. ("Pathé"),[1] is the distributor in the United States and Canada for an animated motion picture entitled "The Illusionist," which is scheduled for release on December 25, 2010. (Barker Decl. ¶ 2.)

In a September 9, 2010 letter, Plaintiff advised Defendants of Plaintiff's ownership rights to "The Illusionist" and demanded that Defendants immediately cease and desist from further promoting their film under the title of "The Illusionist." (Brown Decl. ¶ 9, Ex. B.) On September 21, 2010, SPC informed Plaintiff that it would not comply with Plaintiff's demands. (*Id*. ¶ 10, Ex. C.) On September 29, 2010, Pathé responded and advised Plaintiff that it also would refuse to comply with Plaintiff's demands. (*Id*. ¶ 11.)

On October 19, 2010, Plaintiff filed a complaint in Los Angeles County Superior Court against SPC, Pathé, and Does 1 through 25. Plaintiff asserts causes of action for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), and unfair business practices under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. SPC removed the action to this Court on October 26, 2010 on the basis of federal question jurisdiction. Plaintiff filed the *Ex Parte* Application on November 2, 2010. On November 3, 2010, SPC filed its Opposition.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of TROs and preliminary injunctions, and courts apply the same standard to both. *See Credit Bureau Connection, Inc. v. Pardini*, __ F. Supp. 2d __, 2010 WL 2737128, at *5 (E.D. Cal. July 12, 2010) (citing *Ne. Ohio Coal. for the Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). The purpose of such injunctive relief is to preserve the rights and relative positions of the parties, *i.e.*, the *status quo*, until a final judgment issues. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68

---

[1] Pathé is erroneously sued as "Pathe Pictures." (*See* Notice of Removal ¶ 2.)

1  L.Ed.2d 175 (1981)).  An injunction is an exercise of a court's equitable authority, which
2  should not be invoked as a matter of course, and "only after taking into account all of the
3  circumstances that bear on the need for prospective relief."  *Salazar v. Buono*, __ U.S. __,
4  130 S.Ct. 1803, 1816, 176 L.Ed.2d 634 (2010).
5       A plaintiff seeking injunctive relief must show that (1) it is likely to succeed on the
6  merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3)
7  the balance of equities tips in its favor; and (4) that an injunction is in the public interest.
8  *Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir.
9  2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, __ U.S. __, 129 S.Ct. 365, 374,
10 172 L.Ed.2d 249 (2008)).  An injunction may be appropriate when a plaintiff raises
11 "serious questions going to the merits" and demonstrates that "the balance of hardships
12 tips sharply in the plaintiff's favor."  *Alliance For Wild Rockies v. Cottrell*, __ F.3d __,
13 2010 WL 3665149, at *8 (9th Cir. Sept. 22, 2010) (quoting *The Lands Council v.
14 McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

### III.
### DISCUSSION

**A.      Plaintiff Fails To Demonstrate A Likelihood Of Success On The Merits**

    **1.      Trademark Infringement**

Plaintiff asserts that its film "The Illusionist" has acquired a secondary and distinctive meaning among the public, which has come to identify the title with the Academy Award-nominated motion picture released in 2006 and starring Ed Norton, Jessica Biel, and Paul Giamatti. (Compl. ¶¶ 15, 23.)  Plaintiff contends that Defendants' promotion, marketing, distribution, and release of their picture entitled "The Illusionist" will constitute false designation of origin, false designation of affiliation, and false or misleading representation of fact in violation of the Lanham Act.  (*Id*. ¶¶ 16, 24.)

To prevail on a trademark infringement claim, a plaintiff must show that (1) it has a valid, protectable trademark; and (2) the defendant's use of the mark is likely to cause

confusion. *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). Here, Plaintiff is unlikely to succeed in demonstrating either prong.

A plaintiff can establish that it owns a protectable interest in one of three ways: (1) registering its mark with the United States Patent and Trademark Office; (2) showing that it has a descriptive mark that has acquired a secondary meaning in the market; or (3) showing that it has a suggestive mark, which is inherently distinctive and protectable. *Id.* at 969-70. Because Plaintiff has not registered "The Illusionist" (*see* Compl. ¶ 8), Plaintiff has a valid, protectable trademark only if its mark is sufficiently distinctive or has acquired a secondary meaning in the market.

In characterizing a mark's distinctiveness, the Ninth Circuit utilizes a taxonomy devised by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976):

> [M]arks are placed in one of five categories, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, and fanciful. At one end of the spectrum, generic marks refer to the genus of which the particular product is a species, such as "bread" or "door," and are not registerable as trademarks. At the other end of the spectrum are arbitrary marks—actual words with no connection to the product—such as Apple computers and Camel cigarettes, and fanciful marks—made-up words with no discernable meaning—such as Kodak film and Sony electronics that are inherently distinctive and therefore receive maximum trademark protection. In the middle are descriptive marks, which describe the qualities or characteristics of a good or service and only receive protection if they acquire secondary meaning, and suggestive marks, which require a consumer to use imagination or any type of multistage reasoning to understand the mark's significance and automatically receive protection.

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010) (internal citations, quotation marks, and brackets omitted).

Assuming, as Plaintiff argues, that "The Illusionist" is descriptive, Plaintiff must show that the mark has acquired a secondary meaning. Plaintiff maintains that its film's "box office success" and "well-known reputation" are "directly attributable to the substantial marketing campaign undertaken by Plaintiff and its agents and affiliates." (*Ex Parte* Appl. at 11.) Plaintiff spent more than $18 million to market and advertise "The Illusionist" for its theatrical release in the United States and undertook a marketing campaign costing $11 million to market DVD sales of "The Illusionist" in the United States. (Brown Decl. ¶¶ 5-6.) The film generated more than $88 million in gross receipts worldwide. (*Id.* ¶ 5.) A "large expenditure of money," however, "does not in itself create legally protectable rights." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1180 (9th Cir. 2010) (quoting *Smith v. Chanel, Inc.*, 402 F.2d 562, 568 (9th Cir.1968)) (quotation marks omitted). Plaintiff provides no other evidence that "The Illusionist" has acquired secondary meaning.

In any event, Plaintiff also fails to demonstrate a likelihood of consumer confusion. To evaluate whether the use of a mark is likely to confuse consumers, courts consider eight non-exhaustive factors (the "*Sleekcraft* factors") whose relative importance will vary from case to case: "(1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product." *Fortune Dynamic*, 618 F.3d at 1030 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). The inquiry may proceed in any order and a court need not address every factor. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009), *cert. denied*, 130 S.Ct. 1739, 176 L.Ed.2d 213 (2010).

Notwithstanding that the marks at issue are identical, there is little likelihood of consumer confusion. Plaintiff's mark is weak. It generically describes a movie about an illusionist rather than Plaintiff's product in particular. As SPC points out, there are works

galore with that title, including a film released in 1983, as well as at least 14 books published since 1952, 12 of which are still in print. (Kramer Decl., Ex. 1 at 1, 5-17.) In addition, a wide variety of consumer products employ the term "illusionist" in some variation in their registered trademark. (*Id*. at 19-25.) More still, thousands of magicians perform under the description "illusionist." (*See id*. at 72-74, 89, 97-209.)

Although both products are movies about illusionists, they are so different that there is little chance that consumer confusion will ensue. Plaintiff's motion picture is based on the 1989 short story "Eisenheim the Illusionist," written by Pulitzer prize-winning novelist Steven Millhauser. It is set in Vienna at the turn of the twentieth century. Its plot centers on a stage magician named Eisenheim (played by Ed Norton) who seemingly possesses extraordinary powers and falls in love with a duchess named Sophie (played by Jessica Biel). After years of travel, Eisenheim returns to Vienna as a master illusionist and learns that Sophie is set to be married against her wishes to the crown prince, who is planning a coup to overthrow his aged father, the emperor. A detective (played by Paul Giamatti) is on the illusionist's trail. The movie culminates in a twist, involving an apparent murder, in which Eisenheim uses his superior skills as an illusionist to escape with Sophie to start a new life. (Brown Decl. ¶ 4; Barker Decl. ¶ 5.)

Defendants' motion picture is an animated art film based on a screenplay written in the 1950s by famed French mime, actor, and film director Jacques Tati. It is set in Scotland in the 1950s or 1960s. The film contains virtually no dialogue or voiceovers. The main character, an animated version of Jacques Tati, is a struggling illusionist who is becoming older and weaker in the face of a new era of Rock-n-Roll and other modern forms of entertainment. The only "gig" that the illusionist can obtain is at a small pub on the Scottish shore. There, he meets a teenage girl who has never been out of the village, and who believes the illusionist's tricks to be real. The girl follows the illusionist to Edinburgh, where the two develop a caring, quasi-father-daughter relationship. (Carcassone Decl. ¶ 5; Barker Decl. ¶¶ 2-4.)

Defendants' film has always been called "The Illusionist" (or, in the original French, "L'Illusionniste") and their choice of title has nothing to do with Plaintiff's film. (Carcassone Decl. ¶¶ 2, 8.) There is no indication that Defendants intend to market their film to the same audience as Plaintiff's. Defendants' movie is geared toward animation aficionados and fans of independent art films. Plaintiff's movie has been advertised as a mainstream, live-action "period piece" of interest to the general public. (*Id.* ¶ 7; Barker Decl. ¶ 5.) Plaintiff presents no evidence of actual consumer confusion.

In sum, the *Sleekcraft* factors weigh against a finding of likely consumer confusion between the two films. Plaintiff is thus unlikely to meet either of the prongs to establish trademark infringement.

Plaintiff's trademark infringement claim is unlikely to succeed for an additional reason: Defendants have a strong First Amendment defense. The Ninth Circuit has adopted the Second Circuit's approach in *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989), to test whether the First Amendment limits application of the Lanham Act. Under the Second Circuit's approach, courts construe the Lanham Act to apply to artistic works—particularly an artistic work's title—"*only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression." *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (quoting *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003)) (quotation marks omitted). "An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable unless the use of the mark has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless it explicitly misleads as to the source or the content of the work." *Id.* (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002)).

Here, Defendants' use of "The Illusionist" clearly has artistic relevance to their film—it describes the main character. Moving to the second prong of the *Rogers* test, Defendants' title does not explicitly mislead as to the source of the work. *See MCA Records*, 296 F.3d at 902 ("The only indication that [the plaintiff] might be associated

with the [defendant's work] is the use of [the plaintiff's trademark] in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity."). Accordingly, Plaintiff's claim will likely fail on First Amendment grounds as well.

### 2. Unfair Competition Law

The UCL prohibits "unfair competition," which it defines to include "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. It covers "anything that can properly be called a business practice and that at the same time is forbidden by law," and "governs anti-competitive business practices as well as injuries to consumers." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548 (1999). Section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. *Id.*

Plaintiff's only basis for a UCL claim is Defendants' alleged trademark infringement. Because Plaintiff's trademark causes of action are unlikely to succeed on the merits, Plaintiff's UCL claim is also likely to fail.

### B. Plaintiff Fails To Demonstrate A Likelihood Of Irreparable Harm

Plaintiff, having been unable to show a trademark violation, is unlikely to be harmed if the Court allows Defendants to market and distribute their film. Plaintiff asserts that irreparable harm will result if Defendants' film proves to be unpopular with the American public because consumers' negative attitude would permanently impact their perception of Plaintiff's film. As discussed *supra*, however, it is unlikely that consumers would confuse the two films such that negative sentiments about one would affect public opinion about the other.

### C. The Balance Of Hardships Favors Defendants

The balance of equities tips sharply in favor of Defendants. Plaintiff is attempting to protect the remaining revenue streams on a nearly five-year-old film from the unlikely confusion that might be caused by a similarly titled but otherwise unrelated movie. In contrast, an injunction would cause immediate and irreparable damage to Defendants and

their film's prospects.  Art films require a cost-effective way of developing an awareness and profile of the film, which entails many screenings (both press and film festivals) over the course of a long period prior to the film's release.  (Barker Decl. ¶ 6.)  Thus, Defendants cannot simply release their film under a different name.  The December 25, 2010 release date was specifically chosen in order to make Defendants' picture eligible for year-end award consideration, including consideration for Academy Awards.  (*Id.* ¶ 9.)  Any delay would jeopardize the film's chances for an award, putting the film's revenues further at risk, as an Academy Award nomination can increase a film's domestic receipts by as much as double.  (*Id.*)  Therefore, the speculative harm to Plaintiff from allowing the distribution of Defendant's picture is far outweighed by the concrete and immediate harm to Defendants from an injunction.

**D.     An Injunction Is Not In The Public Interest**

Finally, the Court must consider the public interest.  While the public has an interest in trademark enforcement, it has no interest in seeing the enforcement of unprotectable marks.  The public has a substantial interest in preventing artistic expression from becoming stifled by overzealous intellectual property protection.

**V.**

**CONCLUSION**

In light of the foregoing, Plaintiff's *Ex Parte* Application is DENIED.

**IT IS SO ORDERED**.

DATED:    November 4, 2010

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE